## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 22-cv-23847-BLOOM/Goodman

ERIC WARD, *et al*.,

     Plaintiffs,

v.

M/Y UTOPIA IV, *Official No.*
*1305829, MMSI No. 339328000,*
*her engines, tackle, gear,*
*appurtenances, etc.*, *in rem*, and
UTOPIA YACHTING, LLC,
*in personam*,

     Defendants.

_____/

### <u>OMNIBUS ORDER</u>

**THIS CAUSE** is before the Court upon Defendants M/Y Utopia IV and Utopia Yachting,

LLC's ("Defendants") Motion to Amend the Judgment ("Motion to Amend"), ECF No. [416] and

Renewed Motion for Judgment as a Matter of Law ("Motion for Judgment"), ECF No. [417], both

of which were filed on May 19, 2025. Plaintiffs[1] Eric Ward and Fred Wennberg ("Plaintiffs") filed

a Response to both Motions, ECF Nos. [434], [435], to which Defendants filed their Replies. ECF

Nos. [440], [439]. The Court has reviewed the Motions, the supporting and opposing submissions,

the record in this case, the applicable law, and is otherwise fully advised. For the reasons set forth

below, Defendants' Motions are granted in part and denied in part.

---

[1] Plaintiff Samuel Parrott was not a party to any of the briefs. Accordingly, for purposes of the
Order, "Plaintiffs" refers to Ward and Wennberg. Where the Court intends to refer to one of the
Plaintiffs individually, the Court shall use his name.

## I.  BACKGROUND

Plaintiffs were crew members aboard the *Utopia IV* when it collided with a motor tanker on December 23, 2021. ECF No. [275] at 1. Plaintiffs brought claims for failure to provide prompt and adequate maintenance and cure and wages, Jones Act negligence, and unseaworthiness, based on injuries they suffered from the collision. ECF Nos. [1], [16]. Wennberg brought additional negligence and unseaworthiness claims for four additional incidents in which he was injured aboard the *Utopia IV.* ECF No. [16]. On March 31, 2025, the case proceeded to a jury trial. ECF No. [361]. At the close of the evidence, Defendants moved for judgment as a matter of law. ECF No. [377]. The motion for judgment was granted in part and denied in part. ECF No. [380]. Consistent with the jury's verdict, the Court entered judgments[2] for Ward in the amount of $805,000.00 and for Wennberg in the amount of $1,492,300.00. ECF Nos. [390], [392].

Defendants move to amend Ward and Wennberg's judgments on three bases. First, regarding Wennberg's award of $181,500.00 in "past lost wages" for Incidents Three and Five, Defendants argue there is no evidence indicating Wennberg lost any wages because of any injuries suffered. ECF No. [416] at 1. Second, Defendants argue Wennberg's awards for "past lost wages" for Incidents Three and Five are duplicative. *Id.* Third, Defendants argue the ratio of punitive damages to compensatory damages awarded to Wennberg and Ward for failure to pay cure exceeds the permissible ratio established by the Supreme Court in maritime cases. *Id.* (citing *Exxon Shipping Co. v. Baker*, 554 U.S. 471 (2008).

Plaintiffs respond that the jury never awarded Wennberg for "lost wages" because the verdict form stated that the $181,500.00 was for "past net lost wage-earning capacity and benefits

---

[2] Consistent with the jury's verdict, the Court also entered judgment for Plaintiff Samuel Parrott in the amount of $591,000.00. However, Defendants have not challenged Parrott's judgment. ECF No. [391].

from incident to the date of trial." ECF No. [434] at 1 (quoting ECF No. [386] at 11, 17). Second, Plaintiffs argue Wennberg did not receive a double recovery because the awards were for "separate and unique incidents that injured . . . Wennberg in different ways." *Id.* Third, Plaintiffs argue the Supreme Court "has not imposed a hard and inflexible punitive damage cap in [m]aintenance and [c]ure cases[.]" *Id.* at 7. Defendants reply that even if Wennberg's award was for diminution in earning capacity and not lost wages, the evidence does not support the award because Wennberg did not stop working due to Incidents Three and Five. ECF No. [440] at 1. Defendants also argue that the punitive damages cap established in *Exxon* applies and that, when applying that cap, "courts take into account only the *relevant* compensatory damages; here, the awards for maintenance and cure." *Id.* at 1-2.

Defendants also seek judgment as a matter of law on three bases. First, Defendants argue there was no evidence to support an award of cure to Wennberg for Incidents Three and Five because he never stopped working, continued to receive his full wages through the end of his employment, and the Defendant also paid the medical bills that he submitted. ECF No. [417] at 1. By extension, Wennberg should not have received punitive damages for failure to pay cure. Second, Wennberg was improperly awarded money to compensate for "his past lost wages (or past lost earning capacity)" despite the fact that he never stopped working as a result of injuries sustained from Incidents Three and Five. *Id.* Third, Defendants argue there is insufficient evidence to support an award for willful failure to pay cure to Ward and Wennberg. *Id.* at 2, 5.

Plaintiffs respond that the fact Wennberg never stopped working has no bearing on Defendants' cure obligations because Defendants were required to pay Wennberg cure until he obtained maximum medical improvement. ECF No. [435] at 5. Second, Plaintiffs argue that Defendants incorrectly conflate lost wages with past loss of earning capacity, which are two

separate and unique elements of damages. *Id.* at 12. Third, Plaintiffs point to evidence in the record supporting Ward and Wennberg's punitive damages award for willful failure to pay cure. *Id.* at 9-12, 14-19.

Defendants reply that Plaintiff "conflates the issues of *entitlement* to maintenance and cure with the appropriate time for *termination* of those benefits." ECF No. [439] at 1. Therefore, Wennberg was not entitled to cure once he returned to work. *Id.* Second, there was insufficient evidence to support Wennberg's award for past lost wages or past lost earning capacity. *Id.* at 4. Third, Plaintiffs' evidence is insufficient to support Ward's or Wennberg's award for willful failure to pay cure. *Id.* at 3, 6-8.

## II. LEGAL STANDARD

### A. Rule 50(b)—Motion for Judgment as a Matter of Law

"Under Federal Rule of Civil Procedure 50, judgment as a matter of law is appropriate only if 'the facts and inferences point so overwhelmingly in favor of one party . . . that reasonable people could not arrive at a contrary verdict.'" *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1173 (11th Cir. 2010) (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1526 (11th Cir. 1997)). A Rule 50(b) motion is made after the case has been submitted to the jury, "thereby insuring that a motion for such a judgment is used only to invite the district court to reexamine its decision not to direct a verdict as a matter of law, not to reexamine facts found by the jury." 27A Fed. Proc., L. Ed. § 62:695 (Supp. 2022) (emphasis added). "[A]ny renewal of a motion for judgment as a matter of law under Rule 50(b) must be based upon the same grounds as the original request for judgment as a matter of law made under Rule 50(a) at the close of the evidence and prior to the case being submitted to the jury." *Doe v. Celebrity Cruises, Inc.*, 394 F.3d 891, 903 (11th Cir. 2004).

"The standard for granting a renewed motion for judgment as a matter of law under Rule 50(b) is precisely the same as the standard" for granting a motion for judgment as a matter of law before it is submitted to the jury. *McGinnis v. Am. Home Mortg. Servicing, Inc.*, 817 F.3d 1241, 1254 (11th Cir. 2016) (quoting *Chaney v. City of Orlando,* 483 F.3d 1221, 1227 (11th Cir. 2007)). When considering a renewed motion for judgment as a matter of law, the Court must consider the evidence in the light most favorable to the nonmoving party and determine "whether or not reasonable jurors could have concluded as this jury did based on the evidence presented." *Combs*, 106 F.3d at 1526 (11th Cir. 1997) (quoting *Quick v. Peoples Bank*, 993 F.2d 793, 797 (11th Cir. 1993)). It is "the jury's task," not the Court's, "to weigh conflicting evidence and inferences, and determine the credibility of witnesses." *McGinnis*, 817 F.3d at 1254 (quoting *Shannon v. Bellsouth Telecomms., Inc.*, 292 F.3d 712, 715 (11th Cir. 2002)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict."). The Court "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000).

**B. Rule 59(e)—Motion to Alter or Amend a Judgment**

Federal Rule of Civil Procedure 59(e) permits a party to file a motion to alter or amend a judgment "no later than 28 days after the entry of the judgment." Fed. R. Civ. P. 59(e). "Relief is proper under Rule 59(e) only if the party presents newly discovered evidence or demonstrates a manifest error of law or fact." *Marques v. JP Morgan Chase, N.A.*, 805 F. App'x 668, 670 (11th Cir. 2020) (citing *Arthur v. King*, 500 F.3d 1335, 1343 (11th Cir. 2007)). "[A] Rule 59(e) motion [cannot be used] to relitigate old matters, raise argument or present evidence that could have been

raised prior to the entry of judgment." *Arthur*, 500 F.3d at 1343 (quoting *Michael Linet, Inc. v. Village of Wellington, Fla.*, 408 F.3d 757, 763 (11th Cir. 2005)).

### C. Remittitur

 "'A federal court has no general authority to reduce the amount of a jury's verdict' because '[t]he Seventh Amendment prohibits re-examination of a jury's determination of the facts, which includes its assessment of the extent of plaintiff's injury.'" *Top Tobacco, L.P. v. Star Importers & Wholesalers, Inc.*, 135 F.4th 1344, 1350 (11th Cir. 2025) (quoting *Johansen v. Combustion Eng'g, Inc.*, 170 F.3d 1320, 1328 (11th Cir. 1999)). "A district court may, however, order a new trial." *Johansen*, 170 F.3d at 1328; *see also* Fed. R. Civ. P. 59(a). Courts' power to "'order' a remittitur grew out of this authority to grant a new trial." *Johansen*, 170 F.3d at 1328. Therefore, "[a] court which believes the jury's verdict is excessive may order a new trial unless the plaintiff agrees to remit a portion of the jury's award." *Id.* "The court orders a remittitur when it believes the jury's award is *unreasonable* on the facts. A constitutional reduction, on the other hand, is a determination that the law does not permit the award." *Id.* at 1331. Therefore, the court "proceeds under Rule 50, not Rule 59, in the entry of judgment for a constitutionally reduced award and the Seventh Amendment is not implicated in this legal exercise." *Id.*

## III. DISCUSSION

### A. Past Net Lost Wage-Earning Capacity for Incidents Three and Five

Defendants first argue that the jury improperly awarded Wennberg $181,500.00 in past wages[3] for Incidents Three and Five even though there was no evidence indicating Wennberg lost

---

[3] The verdict form stated that this award was for "[p]ast net lost wage-earning capacity and benefits from incident to the date of the trial[.]" ECF No. [386] at 11, 17. The verdict form further instructed jurors "[d]o not include unearned wages in this total if you awarded unearned wages as part of maintenance and cure[.]" *Id.*

any wages because of those injuries. Defendants' argument is based on the premise that, even though the verdict form stated that the award was for "[p]ast net lost wage-earning capacity and benefits from incident to the date of the trial," ECF No. [386] at 11, 17, the jury, was, in fact, awarding Wennberg for past lost wages. ECF No. [416] at 2 n.1. Assuming the awards were for past lost wages, Defendants argue these awards were improper because (1) the two $181,500.00 awards were duplicative of one another; and (2) there was no evidence that Wennberg was deprived of lost wages as a result of Incidents Three and Five. *Id.* at 2-3.

The Court first addresses Defendants' claim that, despite the verdict form stating that the awards were for "[p]ast net lost wage-earning capacity and benefits from incident to the date of the trial," the awards were, in fact, for past wages. The verdict form also instructed that that the jury should "not include unearned wages in this total if you awarded unearned wages as part of maintenance and cure." ECF No. [386] at 11, 17. Defendants point out that the jury instructions stated:

> [i]f you find that damages have been proved by a preponderance of the evidence, you should consider only the following elements of damage:
> - net lost wages and benefits to the date of trial;
> - net lost wages and benefits in the future [reduced to present value];
> - medical and hospital expenses incurred in the past [and likely to be incurred in the future]; and
> - physical and emotional pain and anguish.

ECF No. [383] at 21.

Defendants did not object to the jury instructions or verdict form—which would be governed by Federal Rule of Civil Procedure 51[4]—but argue that the Court should "modify the

---

[4] Defendants do not suggest that they timely objected to this purported inconsistency, nor is such an objection reflected in the record. The Eleventh Circuit has interpreted Rule 51 "strictly" and to "require a party to object to a jury instruction or jury verdict form *prior* to jury deliberations in order to preserve the issue on appeal." *Teel v. Lozada*, 99 F.4th 1273, 1281 (11th Cir. 2024) (quoting *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1329 (11th Cir. 1999)). The only

jury's verdict" because the jury awarded Wennberg lost wages despite the fact that "[t]here is no record evidence that . . . Wennberg was deprived of lost wages as a result of his injuries in either the third or fifth incidents [because] [h]e never stopped working after any of the incidents[.]" ECF No. [416] at 3 (citing ECF No. [413] at 116:2-4).

First, the Court rejects Defendants' argument that the $181,500.00 awarded for Incidents Three and Five were necessarily awarded as "unearned wages." Loss of earning capacity and unearned wages are distinct legal concepts that may constitute independent elements of a damages award. *See Weeks Marine, Inc. v. Wright,* No. 14-cv-00231, 2015 WL 4389918 (S.D. Ala. July 15, 2015) ("Under the Jones Act and general maritime law, an injured seaman is entitled to monetary recovery for past, present, and future loss of earning capacity *and* wages[.]") (emphasis added). Courts have recognized, in non-Jones Act contexts, that "[l]oss of earning capacity is . . . distinguishable from past lost wages." *Parker v. Barriere Constr. Co.*, LLC, No. 23-cv-2010, 2024 WL 3677167, at *2 n.12 (E.D. La. Aug. 5, 2024) (describing Louisiana state law); *see also United States Sec. & Exch. Comm'n v. Heartland Grp. Ventures, LLC,* No. 4:21-cv-01310, 2024 WL 3431345 (N.D. Tex. June 14, 2024) ("Lost wages are *evidence* of loss of earning capacity") (emphasis added) (citing Texas state law), *report and recommendation adopted,* No. 4:21-cv-

---

exceptions to this rule are "first, where a party has made its position clear to the court previously and further objection would be futile; and second, where it is necessary to "correct a fundamental error or prevent a miscarriage of justice." *Id.* (quoting *Parker v. Scrap Metal Processors, Inc.*, 386 F.3d 993, 1018 (11th Cir. 2004)). To meet the "stringent standard" of fundamental error, "a party must prove that the 'challenged instruction was an incorrect statement of the law and [that] it was probably responsible for an incorrect verdict, leading to substantial injustice.'" *Farley*, 197 F.3d at 1329-30 (quoting *Montgomery v. Noga,* 168 F.3d 1282, 1294 (11th Cir. 1999)). Defendants do not argue that either the jury instructions or verdict form contained incorrect statements of law, but that the jury may have misinterpreted the verdict form, thereby causing the jury to commit legal error by either duplicating an award of past wages or awarding lost wages where there was no evidence to support such a verdict. ECF No. [416] at 2-4. Therefore, neither the verdict form nor the jury instructions contained a fundamental error.

01310, 2024 WL 3451528 (N.D. Tex. July 1, 2024). Furthermore, the language included on Wennberg's verdict form—"[p]ast net lost wage-earning capacity and benefits from incident to the date of the trial"—tracks that which was proposed by Defendant. ECF No. [345-3] at 10, 15. As specifically requested by Defendants, the Court also clarified that the jury should not include in the award any unearned wages that were awarded under the maintenance and cure claims for each incident. *Id*. Therefore, the Court properly interprets the jury's award of $181,500.00 in "[p]ast net lost wage-earning capacity and benefits" for Incidents Three and Five as awards for Wennberg's lost wage-earning capacity and benefits.

Defendants contend that, even interpreting the awards as for lost wage-earning capacity, the evidence does not support such an award "because the injuries from Incidents 3 and 5 did not cause him to stop working." ECF No. [440] at 1. Defendants argue that Wennberg "presented no evidence of past lost earning capacity resulting from either incident." *Id*. at 3. Indeed, as Defendants point out, Plaintiffs' expert, Ira Morris, stated he was "not asked to do an assessment as to loss of earning capacity" with regard to Wennberg. ECF No. [440] at 3 (quoting ECF No. [415-1] at 20:8-14). Morris was hired "to provide assessment as to Mr. Ward's loss of earning capacity and both Mr. Ward and Mr. Wennberg's future care that is anticipated to be reasonably certain to be necessary." ECF No. [415-1] at 8:14-19.

Defendants make the same argument in their Motion for Judgment.[5] Plaintiffs respond that Wennberg testified as to his reduced earning capacity when he described how "his injuries changed the type of work he could take on after the injuries." ECF No. [435] at 14. When asked what type of physical things he used to be able to do as part of his job in 2021, Wennberg responded:

---

[5] In the Motion to Amend, Defendants raise the argument for the first time in their Reply that Plaintiffs did not present any evidence of Wennberg's past loss of earning capacity. ECF No. [440]. Therefore, Plaintiffs did not have the opportunity to respond for purposes of the Motion to Amend.

Well, you have to be able to bend down, crawl around on the deck plates sometimes. And you know, if it's for me to do it, it's harder for me to do that kind of stuff now. Like, sometimes something could be underneath the floor plate where you have to lift all the plates out, and then go down in there and work on something, like a pipe, or a hose, or something, or the air-condition system. And you get in spots where you have to move and be where you can move around and twist around and do it. I'm not capable of doing any of that kind of work now. . . [I]f I take some kind of work, it was going to be –I'm going to be doing paperwork or something that I can move around and just walk down and do whatever I need to do.

ECF No. [413] at 50:22-51:19.

Defendants argue that this testimony does not constitute evidence "showing that Wennberg sustained a loss of earning capacity . . .  as a result of the physical limitations he described." ECF No. [439] at 5.

The Eleventh Circuit has instructed that "[a] jury award for lost earning capacity must be supported by record evidence of the upper limit of the plaintiff's post-injury earning capacity." *Buland v. NCL (Bahamas) Ltd*, 992 F.3d 1143, 1152 (11th Cir. 2021). In *Buland*, the Eleventh Circuit held that there was "a significant gap between the 10-hour workweek [plaintiff] testified he could handle and the 60-hour workweek his medical experts testified he could no longer handle." *Id.* Because the plaintiff "failed to present evidence that 'the part-time jobs *he believes* he is qualified and capable of performing . . .' represent the full extent of his post-injury earning capacity . . . any jury award for lost earning capacity would have been unduly speculative." *Id.* Here, although Wennberg testified that "for about two and a half years I didn't do any work. I went to doctors and I wasn't workable[,]" ECF No. [413] at 110:12-16, that is the extent of the evidence supporting Plaintiffs' argument that Wennberg sustained a loss of earning capacity. As Defendants point out, Wennberg voluntarily continued working aboard the *Utopia IV* after Incidents Three and Five. ECF No. [417] at 4-5. Wennberg also stated that he would have continued working on the *Utopia IV* if he hadn't been fired. *Id.* at 5 (quoting ECF No. [412] at 111:1-6). Additionally, Defendants elicited testimony from Wennberg that, following his firing from the *Utopia IV*,

Wennberg accepted five temporary positions and worked for a total of 107 days. ECF No. [413] at 110:12-113:25. Plaintiffs offer no explanation for Wennberg's ability to "work for 21 days straight" as the chief engineer on a tug "with no problem," *id.* at 110:17-113:16, a fact which undermines Wennberg's testimony that he "wasn't workable." *Id.* at 110:14-16. Nor do they explain Wennberg's ability to hold any of the other temporary positions.

Plaintiffs cite a series of cases which purportedly support that "[p]ast loss of earning capacity is awarded to personal injury plaintiffs regardless of that plaintiff's employment status." ECF No. [435] at 12. Although Plaintiffs cite non-binding cases which support the proposition that a plaintiff's *lack* of employment at the time of injury does not eliminate the availability of damages for loss of earning capacity, they do not cite to any case law that a plaintiff may recover for loss of earning capacity even where he returned to the same job he held prior to the injury, continued to work in the same role for other companies, and did not present any expert testimony at trial regarding past loss of earning capacity. *See id.* at 12-13.

In *Tankersley v. Protective Ins. Co.*, the court upheld the jury's award of past loss of earning capacity even though "[i]f one focused on what [the plaintiff] was earning at the time of his accident . . . and compare that with his income following the accident . . . [the plaintiff] actually made more after the accident than he was making at the time it occurred." No. 22-cv-00285, 2024 WL 3171842, at *9 (M.D. La. June 25, 2024). However, *Tankersley* is distinguishable in several key respects. First, the plaintiff in *Tankersley* introduced at trial an expert who "testified credibly" as to the plaintiff's pre-injury earning capacity and provided a "detailed explanation for how he arrived at that amount." *Id.* The plaintiff also introduced "credible and persuasive" expert testimony from an economist who "calculated [the plaintiff's past loss of earning capacity between the time of his accident and the time of trial" and the defendants "offered no economic testimony

to the contrary." *Id.* By contrast, as Defendants note, Plaintiffs did not introduce any expert testimony regarding Wennberg's past earning capacity. ECF No. [440] at 3. Second, in *Tankerlsey*, the Court found that "testimony of [the plaintiff], his wife, his treating doctors, and . . . [the plaintiff's] vocational rehabilitation expert" all provided "consistent" testimony, leading the court to "conclude[] that [the plaintiff] is no longer able to do the kind or amount of work he did before the accident and has suffered a significant loss of earning capacity as a result of the accident." *Tankersley*, 2024 WL 3171842, at *9. By contrast, the sole evidence Plaintiffs presented that "the injuries that Wennberg suffered diminished his ability to work" was Wennberg's own testimony that "his injuries changed the type of work he could take on after the injuries . . . as he was now working different types of jobs with more physical restrictions." ECF No. [435] at 13-14. Third, although the plaintiff in *Tankersley* earned more immediately following his injury than immediately before the injury, that was because, shortly before the injury, the plaintiff quit working "as a mechanic/millwright" to start his own business; however, "the business was unsuccessful and operated at a net loss." *Tankersley*, 2024 WL 3171842, at *8. The court stated that there was "uncontradicted and credible evidence that [the plaintiff] is no longer able to do the kind or duration of work he did before the accident, and when he has made an effort to do so, has 'paid dearly.'" *Id.* at *9. However, the evidence supports that Wennberg continued to work as the chief engineer aboard the *Utopia IV*, the same position he held prior to his injuries. ECF No. [417] at 8. After he was fired, he worked as the chief engineer aboard another vessel as well. ECF No. [413] at 112:2-6.

Similarly, Plaintiffs' citation to *Johnson v. LSU Medical Center* is inapposite. There, the court found that, despite returning to the job she held prior to her injury, the plaintiff "was not functioning on the same level as she was before her injury[]" and "as a result of the injury, she lost

the capacity to work full time as a medical office manager." 867 So. 2d 884, 890 (La. Ct. App. 2d 2004). Furthermore, in *Johnson*, the plaintiff introduced testimony from multiple experts, including "an expert in vocational rehabilitation" who "found that upon [the plaintiff's] return to work after the injury, she had trouble doing her work." *Id.* at 889. The vocational rehabilitation expert also testified that the plaintiff "could continue to do clerical work, but it would be slower and more laborious[,]" and that plaintiff "would have trouble working an eight-hour day[.]" *Id.* The plaintiff also introduced testimony "concerning the lost wage analysis" conducted on the plaintiff. *Id.* However, in the present case, Plaintiffs did not introduce any expert testimony regarding Wennberg's loss of earning capacity.

Plaintiffs' citation to other cases for support that past loss of earning capacity "is awarded to personal injury plaintiffs regardless of that plaintiff's employment status[,]" is unpersuasive. For example, Plaintiffs cite *Bernard v. Casualty Reciprocal Exchange*, which merely states that plaintiffs who were *unemployed* at the time of their accident are not necessarily barred from recovering based on loss of earning capacity. 534 So. 2d 1348, 1356 (La. Ct. App. 5th 1988) ("A person who regularly works but who happens to be unemployed at the time of a disability accident suffers a loss of, and is entitled to special damages for, the wages he probably would have earned but for the accident, although it is plaintiff's burden to prove his probable earnings.").

Plaintiffs also cite to *Ore v. Tricam Industries, Inc.* as "awarding *past loss of earning capacity* to an employee of Tire Kingdom." ECF No. [435] at 13 (citing *Ore v. Tricam Indus., Inc.,* No. 14-cv-60269, 2017 WL 6597517 (S.D. Fla. Oct. 16, 2017)). Although the jury originally awarded "loss of earnings in the past" and "future loss of earnings," the court granted the motion for directed verdict on damages, *reducing* the award for past loss of earning capacity because the plaintiff suffered a stroke following his accident and "it was incumbent upon [plaintiff] to present

sufficient evidence from which the jury could find that his claimed loss of earning capacity resulted from the ladder fall." *Ore*, 2017 WL 6597517, at *2. As in the present case, Wennberg's damages for loss of earning capacity is "an element of economic damages for which [he] bears the burden of proof." *Id.* at *2. Therefore, even if past loss of earning capacity is an element of damages, it is still incumbent upon Wennberg to prove that he suffered such a loss.

Indeed, some of the cases Plaintiffs cite appear to undermine their argument. Plaintiffs claim that *Auto Club Ins. Co. of Fla. v. Babin*, 204 So. 3d 561 (Fla. 5th DCA 2016) "award[ed] past loss of earning capacity in Florida." ECF No. [435] at 13. This is untrue. Following a jury trial, the appellee in *Auto Club* was awarded "$70,000 in past lost earnings" and "$72,000 in lost earning ability for future years." 204 So. 3d at 562. On appeal, the Court addressed the award for past lost wages and loss of future earning capacity together, specifically stating "[i]n order to recover damages for lost earning capacity, [appellee] was required to prove, with reasonable certainty, a loss of earning capacity as a result of his injury . . . This he failed to do." *Id.* at 565. Therefore, the Court *reversed* the jury's award of future medical expenses, past lost wages, and future earning capacity. *Id.* Indeed, *Auto Club* undercuts Plaintiffs' argument by finding that "there was no evidence presented to indicate [appellee] was *completely disabled from further gainful employment as a result of his injury*." *Id.* (emphasis added). As was the case with Wennberg, "the record reveals he had the capacity to earn an income" although the appellee's "testimony focused on his inability to work" in a particular field. *Id.*

Nor does Plaintiffs' citation to *Lobegeiger v. Celebrity Cruises, Inc*. support Wennberg's argument. No. 11-cv-21620, 2011 WL 3703329 (S.D. Fla. Aug. 23, 2011). Plaintiffs emphasize *Lobegeiger's* statement that "[w]ith few exceptions, the rules that define damages recoverable in maritime personal injury actions do not vary with the status of the parties. Medical expenses, loss

of wages, loss of future wages, **loss of earning capacity**, and pain and suffering are the same regardless of whether the injured plaintiff is a seaman, longshoreman, harbor worker, off-shore worker, passenger or recreational boater." ECF No. [435] at 13 (emphasis in original) (quoting *Lobegeiger*, 2011 WL 3703329, at *5 n.5). However, *Lobegeiger* dealt with a passenger who was injured aboard a cruise. Therefore, the Court included this quote from an admiralty and maritime law treatise solely to clarify that, contrary to the defendant's argument, passengers are also entitled to recover for pain and suffering due to personal injury in a general maritime case. *Lobegeiger*, 2011 WL 3703329, at *5 (citing Robert Force & Martin J. Norris, The Law of Maritime Personal Injuries § 11:8 (5th ed. 2010 Supp.)). *Lobegeiger* therefore has no bearing on the present case.

The Court is bound by *Buland*. There, the Eleventh Circuit affirmed the district court that granted a directed verdict against a maritime personal injury plaintiff who "failed to present evidence that 'the part-time jobs *he believes* he is qualified and capable of performing, such as sitting on corporate boards, and part-time university level teaching,' represent the full extent of his post-injury earning capacity." 992 F.3d at 1152. Because the plaintiff did not have any evidence establishing the full extent of his post-injury earning capacity, "any jury award for lost earning capacity would have been unduly speculative" and "there was no legally sufficient evidentiary basis for the jury to award [the plaintiff] damages for loss of earning capacity." *Id.*

Here, because no reasonable juror could have concluded that Wennberg was entitled to past loss of earning capacity based on the evidence presented at trial, Defendants' Motion for Judgment is granted as to Wennberg's damages for past loss of earning capacity for Incidents Three and Five. Because the Court grants Defendants' Motion for Judgment as to Wennberg's damages for past loss of earning capacity for Incidents Three and Five, the Court need not consider Defendants' arguments that the awards are duplicative. ECF No. [416] at 1.

### B.  Cure for Incidents Three and Five

Defendants argue that the jury's award of $150,000.00 in cure for Incident Three and $30,000.00 for Incident Five were improper because Wennberg "never stopped working," "continued to receive his full wages through the end of his employment on the *Utopia IV*," and the vessel also "paid the medical bills that he submitted." ECF No. [417] at 1. Because Wennberg was not entitled to cure for either incident, Defendants argue Wennberg also should not have been awarded punitive damages for failure to pay cure. *Id.*

The Court instructed the jury that "'Maintenance and Cure' is provided to a seaman who is disabled by injury or illness while in the ship's service. It includes medical care and treatment and the means of maintaining one's self during the convalescence period." ECF No. [383] at 10; 11th Cir. Pattern Jury Instructions 8.2 (2024). "'Cure' includes the cost of medical attention, including hospitalization, medicines, medical apparatuses, and the services of physicians, nurses, and other medical professionals." ECF No. [383] at 11; 11th Cir. Pattern Jury Instructions. Defendants argue "it was undisputed at trial that Defendants paid all of Plaintiffs' medical bills." ECF No. [417] at 3. Indeed, the Court engaged in a colloquy with both counsel in which Plaintiffs' counsel appeared to agree that the medical bills for all three Plaintiffs have been paid.

> The Court: Mr. Bayer, you have continually advised the Court, as well as the jury, that the bills have been paid -- and to the extent that the Defendants have paid these bills -- and I'm not just speaking with regard to Mr. Ward. I'm speaking with regard to Mr. Parrott and Mr. Wennberg -- I'm not understanding why the bills cannot be introduced as one agreement so that we don't need to take the time to introduce them piecemeal, if, in fact, the Defendant has paid every bill.
>
> . . .
>
> But I'm talking about specifically the bill itself, because I'm looking at an exhibit list that has many, many, many medical bills, and it seems that they are not in dispute that this is the amount of the bill and the bill was eventually paid.
>
> Mr. Vartak: Agreed. That should not be in dispute.

ECF No. [409] at 68:5-72:10.

Plaintiffs respond that this was not a concession that all of Wennberg's medical bills have been paid. ECF No. [435] at 9. Instead, Plaintiffs' counsel was stating that "[w]hat 'should not be in dispute,' . . . was the admission of Wennberg's many billing records as exhibits since Defendants did not dispute their authenticity and it was agreed by both parties that almost all of them were not paid." *Id.* Plaintiffs cite to several points in Wennberg's testimony in which he states that he paid his own medical bills out of pocket but was never reimbursed for these expenses. ECF No. [435] at 5-7 (citing ECF No. [412] at 91:8-15, 102:23-103:1, 124:10-23, 90:2-25, 97:22-98:20). Plaintiffs also cite Plaintiff's Exhibit 176, ECF No. [398-14], which "outlines the many medical bills Wennberg paid out of his own pocket without reimbursement or coverage from Defendants for the injuries he suffered from Incident 3 and Incident 5[.]" ECF No. [435] at 5. Defendants do not respond to this argument and argue only that Wennberg is not entitled to cure "because the law does not allow Wennberg to resume working in his normal position and then seek maintenance and cure only after he was fired[.]" ECF No. [439] at 3.As such, Defendants appear to have abandoned the argument that all outstanding medical bills have been paid. *GolTV, Inc. v. Fox Sports Latin Am. Ltd.*, 277 F. Supp. 3d 1301, 1311 n.7 (S.D. Fla. 2017) ("When a party fails to respond to an argument or address a claim in a responsive brief, such argument or claim can be deemed abandoned."). Defendants' argument that there is insufficient evidence to support Wennberg's award of cure following Incidents Three and Five relies upon the Court finding that Wennberg was never entitled to cure in the first instance.

Defendants argue that "[w]hen a seaman voluntarily continues working at his usual post following an injury, he is not entitled to maintenance and cure." ECF No. [417] at 3 (citing *Wilson v. U.S.*, 229 F.2d 277, 780 (2d Cir. 1956)). As an initial matter, Defendants' reliance upon *Wilson*

is misplaced because the Supreme Court explicitly disagreed with *Wilson* in *Vaughan v. Atkinson* in which it stated "[i]t would be a sorry day for seamen if shipowners, knowing of the claim for maintenance and cure, could disregard it, force the disabled seaman to work, and then evade part or all of their legal obligation by having it reduced by the amount of the sick man's earnings." 369 U.S. 527, 533 (1962). Here, the jury found—and Defendants do not dispute—that a preponderance of the evidence showed that Wennberg was injured in Incident Three while in service of the *Utopia IV*. ECF No. [386] at 8. Wennberg testified that, following the December 23, 2021 collision, it was his "responsibility . . . to make sure everything's safe. So I stayed to look at the boat and make sure it was okay, as the three or four people went to the hospital right away. . . And then the next day I rested." ECF No. [412] at 57:12-15. The following day, Wennberg "went to the hospital to get x-rayed and get told what was going on with me." *Id.* at 57:14-15. Plaintiffs also admitted in evidence a letter Wennberg wrote on January 21, 2022—less than a month after Incident Three— in which he explained:

> [a]fter the collision I was not able to go immediately to the hospital as it was important that I stay onboard to secure the boat and inspect the damage . . . The hospital gave me an x-ray of the left side of my body, my hips, and my shoulder due to the impact of me falling into the desk drawers and bulkhead. Due to my standing in the cabin, I received the full force of the crash stop. I would like another doctor's opinion on my condition and injuries.

> ECF No. [398-17].

That letter and Wennberg's testimony contradict Defendants' argument that Wennberg "remain[ed] silent and wait[ed] until such time as pleases his convenience to assert a claim and then recover for days worked on his own free choice[.]" ECF No. [417] at 3 (quoting *Pyles v. Am. Trading & Prod. Corp.*, 372 F.2d 611, 619 (5th Cir. 1967)). Defendants claim that Wennberg chose to "seek maintenance and cure only after he was fired[.]" ECF No. [439] at 3. However, in

his January 21 letter[6], Wennberg asked "Would it be alright if I go after the vessel is in the shipyard secured next week and . . . use the new card I have," in order to obtain "another doctor's opinion on my condition and injuries." ECF No. [398-17]. The January 21 letter indicates that, not only did Wennberg seek medical care in the Bahamas following the collision, but he also requested permission from his employer[7] to see another doctor to get a second opinion on his injuries. Because it is the jury's task, not the Court's, "to weigh conflicted evidence and inferences, and determine the credibility of witnesses[,]" *McGinnis*, 817 F.3d at 1254, and "reasonable jurors could have concluded as this jury did based on the evidence presented[,]" Defendants' Motion for Judgment is denied as to Wennberg's award of cure for Incident Three.

On January 22, 2022, according to an accident report[8] from the Captain of the *Utopia IV*, Russ Grandinetti, "[a] battery . . . exploded for unknown reasons and was on the verge of catching fire." ECF No. [398-1] at 3. The Captain stated, "the batteries were so hot they couldn't be handled even with fire gloves. They were disintegrating as they were trying to be removed. This could've been a very serious situation [if it] hadn't been for a quick response to jump on what happened." *Id.* On January 28, 2022, Wennberg emailed the Captain: "January 22, 2022 ECR Battery Explosion and the smoke inhaled; I lost my voice for 5 days I do not know if I had any damage at this time I have not gone to the doctor for that." ECF No. [398-2]. The same day, the Captain followed up on his accident report, stating "[w]ith regards to this report that I sent, I have concerns

---

[6] Wennberg was still working aboard the *Utopia IV* as of January 21, 2022. On February 25, 2022, Wennberg received a letter stating that his services "are no longer needed[.]" ECF No. [398-16].

[7] Wennberg testified that he "told them in a letter saying I wanted to have another opinion of a doctor right away at the States, in the USA." ECF No. [412] at 60:23-25.

[8] The email containing the accident report was sent to Joe Bolyard and Eileen Clare of Market America, Eric Turoff, Volodymyr Antonshchuk, and Peter Selivanoff of Fraser Yachts, with Marc Powell of Market America, chiefengineer@myutopia4.com and 2ndEngineer@myutopia4.com cc'd. ECF No. [398-1] at 3.

about the smoke inhalation from the battery explosion last week. What do you suggest that I do . . . in order to ensure the welfare for the people exposed to this type of smoke?" ECF No. [398-1] at 2. Joe Bolyard of Market America[9] replied "I am not clear on what you are saying. We have breathing apparatus on board for firefighting. Did they not use them? Who made this decision?" *Id.* The Captain responded, "[t]he engineers were next to the batteries when the explosion occurred. They tried to open up the compartment to isolate the problem, my understanding is the heat increased with the smoke, I brought smoke hoods down and had everyone put them on." *Id.* The Captain also stated that "Fred [Wennberg] said he had a bit of a sore throat for a few days but is feeling better as of yesterday." *Id.*

As with Incident Three, Defendants argue that Wennberg continued working following Incident Five and, therefore, should not be entitled to cure. ECF No. [417] at 4. However, as stated, that is not the law. The jury found—and Defendants do not dispute—that a preponderance of the evidence showed that Wennberg was injured in Incident Five while in service of the *Utopia IV*. ECF No. [386] at 14. Wennberg testified that the *Utopia IV* was aware of his injuries shortly after Incident Five and emails entered into evidence support this testimony. ECF No. [413] at 20:14-16; *see also* ECF Nos. [398-1] (Captain's accident report regarding Incident Five), [398-2] (Wennberg's email to Captain regarding Incident Five), [398-6] (Wennberg's request to Defense Counsel for time off following Incident Five); ECF No. [398-7] at 5-6 (Wennberg's request for reimbursement of pulmonologist visit following Incident Five). Therefore, Wennberg did not "remain silent and wait until such time as pleases his convenience" to assert a claim for cure, as Defendants suggest. ECF No. [417] at 3 (quoting *Pyles*, 372 F.3d at 619). Because it is the jury's

---

[9] Wennberg stated Joe Bolyard was "the head of the department at Market America that I used to deal with." ECF No. [413] at 13:16-22.

task, not the Court's "to weigh conflicted evidence and inferences, and determine the credibility of witnesses[,]" *McGinnis*, 817 F.3d at 1254, and "reasonable jurors could have concluded as this jury did based on the evidence presented[,]" *Combs*, 106 F.3d at 1526, Defendants' Motion for Judgment is denied as to Wennberg's award of cure for Incident Five.

### C. Punitive Damages

Defendants attack the jury's award of punitive damages to Wennberg and Ward on two bases: first, in the Motion to Amend, Defendants argue that the ratio of punitive damages to compensatory damages exceeds the permissible ratio established by the Supreme Court in maritime cases. ECF No. [416] at 1. Second, in the Motion for Judgment, Defendants argue there was insufficient evidence to support an award for willful failure to pay cure to both Wennberg and Ward. ECF No. [417] at 2, 5. Because the Court's ruling on the second issue affects the ratio of punitive to compensatory damages, the Court addresses the second issue first.

In *Atlantic Sounding Co., Inc. v. Townsend,* the United States Supreme Court clarified that "settled legal principles" establish that "the common-law tradition of punitive damages extends to maritime claims." 557 U.S. 404, 414 (2009). "Punitive damages have long been an available remedy at common law for wanton, willful, or outrageous conduct" and the jury retains "broad discretion to set damages[,]" including awarding punitive damages. *Id.* at 409.

i.    <u>Wennberg</u>

First, Defendants state "the record reflects Defendants' substantial efforts to reimburse Mr. Wennberg for his medical expenses." ECF No. [417] at 5.  Defendants state they "actively sought to pay Mr. Wennberg's medical bills and allowed him paid time off as soon as he requested it." *Id.* at 6 (citing ECF Nos. [398-5], [398-4], [398-9], [398-6]). Despite Defendants' claim that they "actively sought to pay Mr. Wennberg's medical bills," ECF No. [417] at 6, Defendants conceded

that Wennberg has outstanding medical bills which Defendants have not paid. Plaintiffs respond

and point out that "[f]or all of Wennberg's many medical bills for his treatment for his injuries

stemming from Incident 3 and Incident 5 . . . Defendants paid only a *single* bill, leaving Wennberg

to pay for the rest of his own out of pocket." ECF No. [435] at 10 (citing ECF No. [398-14]).

Although Defendants cite to emails in which at least some of Wennberg's reimbursement requests

were granted, despite Wennberg having "failed to have the captain approve of the expenses," *id.*,

merely pointing to conflicting evidence is insufficient on a motion for judgment as a matter of law.

*Pickett v. Tyson Fresh Meats, Inc.*, 420 F.3d 1272, 1278 (11th Cir. 2005) ("A district court should

grant judgment as a matter of law when the plaintiff presents no legally sufficient evidentiary basis

for a reasonable jury to find for him on a material element of his cause of action.") Furthermore,

as Plaintiffs argue, "Defendants offered no reason, sufficient or otherwise, at trial or in their

Motion, for their failure to pay Wennberg his cure for his treatment for his Incident 3 and Incident

5 injuries." ECF No. [435] at 10. To the extent Defendants argued that "an employer is not obliged

to immediately begin payments" but is permitted to "conduct a reasonable investigation of the

claim and require corroboration without subjecting itself to compensatory or punitive damages,"

the fact that more than *three years* have passed since Incident Five undermines this argument. ECF

No. [417] at 6 (citing *Boudreau v. Transocean Deepwater, Inc.*, 721 F.3d 723, 728 (5th Cir. 2013).

Defendants argue for the first time in their Reply that they "did not receive HIPPA release forms

for Wennberg's treatment until 2023, almost two years after the incidents." ECF No. [439] at 3.

Indeed, the HIPPA waivers appear to have all been signed on June 1, 2023, approximately 15

months after Incident Five. ECF Nos. [396-45] at 2, [396-46] at 2, [396-47] at 2, [397-1] at 2. This

fact still does not explain Defendants' failure to pay Wennberg's cure for Incidents Three and Five

from June 2023 to March 2025. Defendants provide no caselaw to support the argument that a 20-

month delay in payment of cure—which Wennberg immediately notified Defendants he would be seeking—is a reasonable period of time to investigate his claim. As Plaintiffs argue, "laxness in investigating a claim" is one potential example of willfulness meriting punitive damages. ECF No. [435] at 11 (quoting *Hines v. J.A. LaPorte, Inc.*, 820 F.2d 1187, 1190 (11th Cir. 1987). Therefore, there was a legally sufficient basis upon which the jury awarded punitive damages to Wennberg and Defendants' Motion for Judgment is denied.

ii. <u>Ward</u>

Defendants argue that the only evidence of willful and arbitrary behavior in connection with the payment of Ward's cure "was on the part of Ward himself[.]" ECF No. [417] at 2. Defendants state that "[a]bout three weeks after the collision, Defendants retained a medical management company, Medical Solutions Services ("MSS"), for the specific purpose of facilitating payment of medical expenses for seven people injured during the December 23, 2021 collision, including Mr. Ward." ECF No. [417] at 10. MSS initially reached out to Ward on January 5, 2022, but Ward did not contact MSS until May 27, 2022. *Id.* at 11; ECF No. [415-2] at 72:15-21. Defendants argue that because Ward "refused to provide MSS with his medical providers' information, medical records, notice of his appointments," and other information, Defendants were unable to make "the good faith investigation of his claims that the law permits." ECF No. [417] at 11. Therefore, "MSS could not facilitate the payment of, and Defendants could not pay, bills they did not have. Nonetheless, Defendants paid Mr. Ward's medical expenses as they became aware of them." *Id.* (citing ECF No. [394-7]). Regarding the delays in Ward's hip surgery, Defendants argue they "were caused by his requiring additional evaluations from a cardiologist and neurologist, trial conflicts, and internal errors with his medical provider, not Defendants' conduct." *Id.* at 11-12 (citing ECF No. [415-2] at 92:19-24; [409] at 35:2-19, 38:6-9). Plaintiffs respond that

the "most egregious example" of Defendants' "willful failure to pay cure" is their "arbitrary, capricious, and callous disregard for Ward's outstanding hip surgery payments over the course of three years." ECF No. [435] at 14. Plaintiffs argue that "Ward provided multiple signed HIPPA waivers to the Defendants that provided them with every single medical record and bill that needed to be paid directly from each provider." *Id.* (citing ECF Nos. [396-1], [396-1], [396-7], [396-9], [396-10], [396-12]-[396-27]). And because Defendants continually delayed payment of "the needed medical bills to effectuate Ward's hip surgery," the surgery, which was originally scheduled for October 31, 2022, did not take place until February 2025. *Id.* at 15. Defendants reply that the delays "were caused by factors outside of Defendants' control." ECF No. [439] at 7.

Plaintiffs and Defendants offer competing explanations for the delay in Ward's hip surgery. Defendants state that they were not responsible for the first delay in Ward's hip surgery; Defendants were first informed of the procedure on October 18, 2022, when the surgical center provided them with an estimate of the cost, and on October 27, 2022, MSS was told that the surgery had been rescheduled. ECF No. [439] at 7-9 (citing ECF No. [415-2] at 92:1-11). Defendants also "authorized the payment for the surgery" on October 29, 2022. *Id.* at 8 (citing ECF No. [415] at 92:4-12). On October 31, 2022, MSS learned that Ward was required to "undergo more testing out of concern for his history of seizures." *Id.* at 8 (citing ECF No. [415-2] at 93:13-24). However, Plaintiffs state that "Defendants continued to inexplicably delay payment for Ward's neurology tests, such as the MRI and EEG" which were required "to obtain a neurological clearance letter for surgery." ECF No. [435] at 16-17 (citing ECF No. [409] at 22:16-23:2). Although the tests were scheduled in January 2023, Defendants did not pay for the tests until February 2024, pushing the hip surgery back even further. *Id.* at 17 (citing ECF No. [409] at 22:16-23:2). Defendants contend that they paid the surgery center "without receiving medical records[,]" ECF No. [439] at

8, but they do not explain why it took over a year to pay for the neurology tests Defendants admit they knew were necessary for the surgery to proceed. *See* ECF No. [417] at 11 (stating "delays were caused by his requiring additional evaluations from a cardiologist and neurologist . . . " ). Under a renewed Rule 50(b) motion, the Court "must evaluate all the evidence, together with any logical inferences, in the light most favorable to the non-moving party" *McGinnis,* 817 F.3d at 1254 (quoting *Beckwith v. City of Daytona Beach Shores,* 58 F.3d 1554, 1560 (11th Cir. 1995)) and determine "whether the evidence is 'legally sufficient . . . to find for the party on that issue." *Id.* (quoting Fed. R. Civ. P. 50(a)(1)). Indeed, as was the case for Wennberg, there was legally sufficient evidence for the jury to find that Defendants acted willfully and arbitrarily in failing or delaying providing cure to Ward. Moreover. even if all the delays in Defendants' payment of cure were not entirely attributable to Defendants, there is legally sufficient evidence that at least some of the payments, such as the payments for the MRI and EEG, were willfully and arbitrarily delayed. Therefore, the Motion for Judgment[10] is denied.

    iii.   <u>Ratio of Damages</u>

    Defendants argue the Court should amend Ward and Wennberg's judgments "to reflect the appropriate ratio of compensatory to punitive damages in a maritime case, 1:1." ECF No. [416] at 4. In *Exxon,*[11] the Court clarified that, in a case arising under federal maritime jurisdiction, the

---

[10] Defendants repeat some of their arguments that Ward is not entitled to punitive damages in their Motion to Amend. ECF No. [416] at 7-10. For the same reasons the Motion for Judgment is denied, the Motion to Amend is also denied.

[11] *Exxon* dealt with a 1989 disaster in which an oil tanker ran aground, tearing the hull open and spilling 11 million gallons of crude oil into the Prince William Sound. *Id.* at 478. Two minutes before a required turn, the captain of the tanker "left the bridge and went down to his cabin in order, he said, to do paperwork. This decision was inexplicable." *Id.* Experts testified that, based on the captain's blood-alcohol level[11] eleven hours after the spill, "at the time of the spill[, he] must have had a blood-alcohol level of around .241 . . . three times the legal limit for driving in most States." *Id.* at 478-79.

Court "examine[s] the verdict in the exercise of federal maritime common law authority, which precedes and should obviate any application of the constitutional [due process] standard." 554 U.S. at 501-502. Therefore, as in *Exxon*, "[o]ur review of punitive damages today, then, considers not their intersection with the Constitution, but the desirability of regulating them as a common law remedy[.]" *Id.* at 502.

After surveying state statutes and common law, the Court in *Exxon* determined that a 1:1 punitive-to-compensatory ratio is appropriate in "cases like this one, where the tortious action was worse than negligent but less than malicious[.]" *Id.* at 510. The Court found that the states that adopted the 3:1 ratio applied it to cases "involving some of the most egregious conduct, including malicious behavior and dangerous activity carried on for the purpose of increasing a tortfeasor's financial gain." *Id.* Based on statistical analyses of "the median ratio of punitive to compensatory verdicts, reflecting what juries and judges have considered reasonable across many hundreds of punitive awards[,]" the Court determined that "a median ratio of punitive to compensatory damages of about .65:1 probably marks the line near which cases like this one largely should be grouped. Accordingly, . . . we consider that a 1:1 ratio, which is above the median award, is a fair upper limit in such maritime cases." *Id.* at 512-13.

Defendants argue that Wennberg's maintenance and cure awards[12] for Incidents Three and Five should be reduced because they amount to a 3:1 ratio of punitive-to-compensatory damages, which "should be reserved for only the most egregious conduct." ECF No. [416] at 5-6. They also

---

[12] For Incident Three, Wennberg was awarded $450,000.00 for Defendants' willful failure to pay cure (nursing and medical expenses) and $150,000 in cure. For Incident Five, Wennberg was awarded $90,000.00 in willful failure to pay cure (nursing and medical expenses) and $30,000.00 in cure. ECF No. [386] at 9, 15-16.

argue that Ward's Count I award[13] amounts to a 20:1 ratio. *Id.* They state that, under *Exxon*, a 1:1 ratio is appropriate for all counts, however, at most, Ward cannot receive more than a 3:1 ratio. *Id.* at 6, 9-10. Plaintiffs note, however, that *Exxon* is not binding on the present case because "just one year later, the same Supreme Court, in *Atl. Sounding Co. v. Townsend*, 557 U.S. 404, 424 (2009), held that the *Exxon* cap does not apply to maintenance and cure punitive awards." ECF No. [434] at 8.

In *Atlantic Sounding*, the Supreme Court held that "damages for the willful and wanton disregard of the maintenance and cure obligation should remain available in the appropriate case as a matter of general maritime law." 557 U.S. at 424. In a footnote, the Court stated that petitioners did not argue that "the size of punitive damages awards in maintenance and cure cases necessitates a recovery cap, which the Court has elsewhere imposed. . . We do not decide these issues." *Id.* at 424 n. 11 (citing *Exxon*, 554 U.S. at 514-515). Following *Atlantic Sounding*, the "majority of the cases that have squarely considered whether *Exxon* sets a hard rule applicable to all cases hold that it does not." *Kenai Ironclad Corp. v. CP Marine Servs., LLC*, 84 F.4th 600, 609 (5th Cir. 2023) (collecting cases). Although *Exxon* is not controlling, it is still persuasive for its analysis of maritime law and the Court's stated "need to protect against the possibility (and the disruptive cost to the legal system) of awards that are unpredictable and unnecessary, either for deterrence or for measured retribution[.]'" 554 U.S. at 513.

Plaintiffs also argue that, because "*Exxon* does not apply to where a defendant's actions are willful and arbitrary[,]" it cannot apply to the present case because "the only way a jury can award punitive damages" for maintenance and cure "is if they factually find that a defendant's

---

[13] For Count I, Ward was awarded $5,000.00 for delay in payment of cure and $100,000.00 in willful delay of cure (nursing and medical expenses). ECF No. [384] at 2.

actions were willful and arbitrary[.]" ECF No. [434] at 10. Although Defendants argue that "Plaintiffs failed to identify specific conduct that meets the heightened standard of 'exceptional blameworthiness' to exceed the *Exxon* cap," ECF No. [440] at 6, the jury found from a preponderance of the evidence that Defendants willfully and arbitrarily failed to or delayed proving cure to Wennberg and Ward. ECF Nos. [386] at 9, 15; [384] at 2. The 1:1 "cap" that *Exxon* imposed was for "reckless action, profitless to the tortfeasor[.]" 554 U.S. at 510-11. Therefore, even under *Exxon*, which Defendants argue applies to the present case, Defendants would be subject to punitive damages that exceed a 1:1 ratio because their actions were willful. *Id.* at 494 ("Action taken or omitted in order to augment profit represents an enhanced degree of punishable culpability, as of course does willful or malicious action, taken with a purpose to injure."). However, *Exxon* also stated that, based on a survey of state statutes, a 3:1 ratio limit generally applies to "cases involving some of the most egregious conduct, including malicious behavior and dangerous activity caried on for the purpose of increasing a tortfeasor's financial gain." *Id.* at 510.

Regarding Wennberg, Defendants argue that "given that Defendants continuously attempted to, and did, reimburse Mr. Wennberg for his medical bills and allowed him paid time off as soon as he requested it, Defendants' conduct did not rise to the level of the most egregious conduct." ECF No. [416] at 6 (citing ECF Nos. [398-5], [398-4], [398-9], [398-6]). However, the Court must also consider that "where the conduct is intentional and malicious, and the compensatory damages are small, imposing the 1:1 ratio[14] would do little to serve the twin

---

[14] Plaintiffs argue, in the alternative that should the Court find a cap on punitive damages to be appropriate, then the Court should calculate the ratio based on "the total compensatory damages, rather than a line-by-line analysis." ECF No. [434] at 20. The only case Plaintiffs cite to support this argument is *Exxon* which stated that the Court took "for granted the District Court's calculation of the total relevant compensatory damages at $507.5 million." *Id* (quoting *Exxon*, 554 U.S. at 515). As Defendants note, it is unclear how this supports Plaintiffs' argument that the Court should calculate the ratio based on total punitive damages to total compensatory damages given that *Exxon*

purposes of punitive damages: to punish the wrongdoer and deter his and others' similar future conduct." *Kenai*, 84 F.4th at 611 (citing *Exxon*, 554 U.S. at 492). Courts in this district have imposed a wide range of ratios in maintenance and cure cases. In *Varela v. Dantor Cargo Shipping, Inc.*, the Court imposed a nearly 17:1 ratio of punitive damages to compensatory damages for failure to provide maintenance. No. 17-cv-23127, 2017 WL 7184605, at *5 (S.D. Fla. Nov. 14, 2017). The plaintiff in *Varela* injured his foot aboard the vessel, but "did not receive any type of adequate medical attention on board the Vessel[,]" was "denied his wages aboard the vessel and given a plane ticket to return home to Honduras, completely abandoned by the Defendants." *Id.* at *2. After "the inhumane denial of his most basic medical needs," the plaintiff's suffering "escalated to watching the skin and bone on the heel of his left foot physically rot away before his very eyes." *Id.* at *4. Given that the defendants in *Varela* also admitted the plaintiff's well-pleaded allegations as a result of their default, the 17:1 ratio is significantly beyond what would be appropriate here. However, as stated above, given that Defendants' actions were willful and *Exxon*'s statement that a 1:1 ratio was appropriate for a "reckless action, profitless to the tortfeasor," the Court finds that a 3:1 ratio is appropriate in the present case to serve the retributive and deterrent purposes of punitive damages. 554 U.S. at 493, 511.

---

stated it calculated the ratio based on the "total *relevant* compensatory damages[.]" ECF No. [440] at 7 (quoting *Exxon*, 554 U.S. at 515). Indeed, Plaintiffs seek to include Wennberg and Ward's compensatory awards for negligence and unseaworthiness in the ratio calculation even though the jury was not able to award punitive damages for negligence and unseaworthiness. *See* ECF No. [434] at 20-21. It is unclear why it would be appropriate to include Plaintiffs' negligence and unseaworthiness compensatory awards in the ratio given that they were separate claims from the maintenance and cure claims. *See* ECF Nos. [384], [386]. The jury had the opportunity to determine the exact amount of compensatory and punitive damages to which Plaintiffs were entitled based on Defendants' failure to pay cure. Therefore, the most accurate ratio would require comparing apples to apples: comparing punitive damages for failure to pay cure to compensatory damages for failure to pay cure. Accordingly, that is the comparison that the court will adopt.

Because the Court has found that remitter is appropriate, the Seventh Amendment requires that Plaintiffs "be given the option of a new trial in lieu of remitting a portion of the jury's award." *Johansen*, 170 F.3d at 1329. If Plaintiffs do not consent to the remittitur "the court has no alternative but to order a new trial." *Id.*

## IV. CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Defendant's Motion to Amend the Judgment, **ECF No. [416],** is **GRANTED IN PART and DENIED IN PART.**

2. Defendant's Motion for Judgment as a Matter of Law, **ECF No. [417],** is **GRANTED IN PART and DENIED IN PART.**

3. Plaintiff Wennberg's award for Incident 3: Counts 2 and 3 for "[p]ast net lost wage-earning capacity and benefits from incident to the date of the trial[,]" of $181,5000.00 is **STRICKEN**. ECF No. [386] at 11.

4. Plaintiff Wennberg's award for Incident 5: Counts 2 and 3 for "[p]ast net lost wage-earning capacity and benefits from incident to the date of the trial[,]" of $181,5000.00 is **STRICKEN**. ECF No. [386] at 17.

5. Plaintiff Ward's award of punitive damages for "[w]illful delay of nursing and medical expenses[]" is **REDUCED** to $15,000.00. ECF No. [384] at 2.

6. Plaintiffs shall notify the Court if they consent to the remittitur or request a new trial **on or before October 3, 2025.**

Case No. 22-cv-23847-BLOOM/Goodman

**DONE AND ORDERED** in Chambers at Miami, Florida, on September 15, 2025.

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to: Counsel of Record